## WILLIAMS *v.* MUTUAL GAS COMPANY.

(*Supreme Court of Michigan, January, 1884.*)

1. GAS COMPANIES—OBLIGATION TO SUPPLY. A gas company is bound to furnish citizens with gas, in localities where its pipes extend, under reasonable conditions.

2. SAME—SAME—DEPOSIT AS GUARANTY. A requirement on the part of the company that a deposit of money to guaranty the payment of the price of gas used, is not unreasonable, and the company may discontinue the supply of gas unless it is complied with.

Action in damages for withholding gas from the Biddle House, a hotel in Detroit, of which plaintiff is proprietor. The company demanded that plaintiff should keep on deposit with it the sum of one hundred dollars. Plaintiff declined to deposit that sum, and tendered seventy-five dollars, which was refused, and the gas was cut off. The hotel used about sixty dollars worth of gas per week, and its requirements were increasing. The damages are for alleged injury to the business, suffered in consequence of the refusal to supply gas. Defendant had judgment, and plaintiff assigned error.

SHERWOOD, J., in delivering the opinion of the Court, said: This corporation is authorized and permitted to do business in Detroit only upon the ground of public convenience, and that

benefits may accrue to its citizens.    It is true, that neither by
the charter of the company, its articles of association, or the
by-laws of the city, authorizing its existence there, has it the
exclusive right to manufacture and sell gas.    It is, however,
within the experience of us all, and I may say, I think, with
great propriety, within the judicial knowledge of the Courts,
that the manufacture and supply of inflammable gas, for the
purpose of lighting cities, villages, stores, hotels and dwellings,
is not a domestic or family manufacture.    It is carried on
almost exclusively by public or associated capital, and, to
make it a paying industry, requires the exercise and enjoy-
ment of certain rights and franchises only to be acquired from
municipal or State authority.    Associations of this kind, as
has been well said, "are not like trading and manufacturing
corporations, the purview of whose operations is as extensive
as commerce itself, and whose productions may be transported
from market to market throughout the world."    It is not a
trading corporation; its product is designed for the citizen, and
the extent to which it is used depends upon house consump-
tion in the immediate neighborhood and community in which
the manufacture is wrought.    It is in the strictest sense a local
commodity and not commercial.    It can only be used by con-
suming it, and hence, can have no place with articles of trade.
The success of the company greatly depends upon the necessi-
ty of the citizens in the vicinity of its location, and its opera-
tions may seriously affect the public policy and individual
convenience of the community.    The nature of the article
made, the objects of the company, its relations to the commun-
ity, and the rights and privileges it must necessarily exercise,
give the company a public character, and, to a certain extent,
a monopoly which can never be tolerated, only upon the
ground of some corresponding duty to meet the public want.
Such duty rests upon this defendant, and I think it requires
the company to furnish to this plaintiff, at the Biddle House,
the supply of gas demanded under reasonable rules and regu-
lations, but among all such, as might be mentioned, it is with
the defendant to adopt and rely upon such as it may select.
This is its privilege.    The duty of the company towards the
citizen, and that of the citizen towards the company, is some-
what reciprocal, and any rule or regulation or course of deal-

ing between the parties which does not secure the just rights of both ought not to be adopted, and cannot receive the sanction of the Courts. When the defendant company made the connection of its service pipes and mains with the pipes and fixtures of the Biddle House, it imposed upon itself the duty to supply the house and premises upon reasonable terms and conditions with such amount of gas as the owner or proprietor might require for its use, and pay for, so long as the company should exist and do business. If the defendant, as one of such conditions, required the plaintiff to give sufficient security that he would make such·payment and perform such condition, before making such service, I think it would have been reasonable, but in the place of such security the defendant demanded a deposit of money with the company, as had been its custom. This the company had the right to do. The condition was a reasonable one. The requirement of a special contract between the parties, in addition to the deposit of money, may not be unreasonable, still it was quite unnecessary. The law implies all the contract needed, and Courts will enforce it in all cases to the extent necessary to secure the rights of the parties. *Judgment affirmed.*

---

"RINGING THE CHANGES." "Ringing changes," is an ancient custom. The phrase comes from the practice of devout men in olden times of ringing "a peal," or 5,040 "changes;" any less number than that was called, technically, "a touch" or "a flourish." In modern times the phrase has "degenerated." Among the law-abiding class of society it now simply signifies friendly banter, a "turning the tables on a gester;" amongst another class of people "ringing the changes" is a trick practiced, by which, on receiving a good piece of money in payment for an article, and, pretending that it is not good, they return to the buyer a spurious coin in place of the one received. (See 2 Leach., 786.) In *Reg.* v. *Hollis*, 32 Weekly Rep., 372, the English High Court held that obtaining money by this means will sustain a conviction of larceny. In that case, the prisoners, Hollis and Wicks, went to an ˙inn kept by the prosecutor. Wicks asked the barmaid for sixpennyworth of whisky; he put down a half-sovereign; the barmaid gave